Good morning. We have four oral arguments this morning. Two of them are in the same case. We've separated the argument on the appeal and the cross-appeal in No. 18-1590, Ajinomoto v. ITC. We'll begin with the argument on the appeal. Mr. Livingston. And counsel can just stay in their places for a second. Okay. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. On the issue of replacing the native promoter, the ITC's decision should be reversed. The only support for the ITC's construction is a narrowing in the prosecution history that is incorrect for at least three reasons. Isn't there some support in the spec that is the use of the word substitution? That is in the only embodiment. That's correct, Your Honor. The use of the word substitution is used in example four, which is the sole embodiment in the specification. But the other parts of the specification make clear that there are broad methods useful for making these changes to a DNA expression. And what's the state of the record, either the party's submissions or the commission's reliance, and here I'll include either the ALJ or the commission itself, on what you might call extrinsic evidence, that is usage of a phrase like substitute a promoter or replace a promoter, where the word is replace or substitute and the object of the word is the whole promoter, as either being generally used to refer to the entire nucleotide sequence making up the promoter or just you start with one promoter and you end up with another, even if all you've done is replace a component. So I believe neither one of those terms was expressly defined in the extrinsic evidence of record. What was disclosed in the extrinsic evidence of record is that those of skill in the art knew of numerous methods of replacing or changing promoter sequences, such as mutagenesis or we've called kind of wholesale cut and replace. Well, that's not really an issue, right? Everybody agrees that there are ways of doing it. The question is what was meant by the language here. That's correct, Your Honor. So in other words, you're telling us we don't get anything from the extrinsic evidence about the linguistic usage. From the linguistic usage, that's correct, but we do get from the extrinsic evidence that those of skill in the art, those genetic engineers with the toolbox ahead of them to change promoters knew that mutagenesis was a very well-known way to do that for decades and substitution was a different way to do it and there were other methods of increasing expression that were well-known in the art. Okay. So the dialogue between the examiner and the applicant here makes very clear that the issue was not with how to change these promoters, it was with what are the changes to enhance expression occurred and that's clear both from examiner statements and applicant statements. On the examiner side, every single time the examiner identified an issue with the claim, he always tethered that issue to the expression regulation sequence, which is... But you changed the language from altering to replacing. Now, it may not appear to me that it was necessary based on the exchange with the examiner, but you still did it and you put the public on notice of that change, so why shouldn't that change be interpreted exactly the way it was interpreted below by the ITC? You want me to say that change was irrelevant. I don't think any change during prosecution should be treated as irrelevant. People have a right to believe because they're put on notice that you made this change for a reason. So our position is not that it's irrelevant, it's that it can't be so narrowed to just the preferred embodiment in example four and that's clear because the examiner noted that there was mutagenesis, well-known methods of mutagenesis in the record. But there are lots of cases we have where it wasn't necessary for an applicant to limit their claims the way they did, but they nonetheless limited them. And the question isn't what could you have been allowed to claim? The question is what would the world, those of skill in the art reading this prosecution, understand you to have limited yourself to? So those of skill in the art reading our prosecution history would have seen that the examiner said, your substitution is enabled. And in response, we made an amendment from altering to replacing. And we said that's consistent with your recognition. We didn't say it equates to your recognition. And indeed, consistent with does not equal equates. It does not mean equates. And if we had wanted to equate the term replacement with the term substitution, we would have just used the term substitution. There was no need to try a different term unless we were trying to get something else and not limit ourselves. But that's sort of, you're suggesting that basically by choosing a different word, you intentionally created ambiguity in what you were doing. I don't know that we intentionally created ambiguity, but it certainly did create ambiguity. And that's also supported. And you think that ambiguity should inerr to the patentee in a claim construction issue as opposed to a prosecution history estoppel issue. But when I'm construing the claims, if I think it's ambiguous, it should err in favor of the patentee, I'll tell you my natural instinct is quite the opposite since you're the one with the ability and the obligation to put the world on notice. I think that's, we think that inerrs in terms of a disclaimer rule where it has to be clear and unambiguous. And here there's statements in the prosecution history. This isn't about disclaimer. This is more about how we should interpret the scope of the claims. That's a different question from disclaimer. Disclaimer is when there's a plain meaning that absolutely entitles you to something. You don't have that here. You don't have a plain meaning that absolutely entitles you to what you're asking for. You have some ambiguous language where we're not sure what you're entitled to. So disclaimer only comes into play when you're taking something out of what is an otherwise plain meaning. So the examiner noted, and the commission also noted below, that the applicant considered broad methods of changing expression within the scope of its claim. And that is the broad methods that we're talking about. And there must be something in the prosecution history that makes it very clear that you're giving up those broad methods. No, no, it's your claim language which dictates what you considered. There are lots of specs that disclose a million different things and they claim narrowly only one aspect of a particular invention. Often there are continuations, hiding in the wings, waiting with other aspects. But it's not the breadth of what you contemplated that you get coverage for. It's what you claim. And our position is that the term replacement is not so narrow a substitution and it has been used in other art of record that's not prior art, but discusses age-old mutagenesis techniques as a replacement, a single nucleotide as a replacement. But don't we have to assume that it means something different than alteration? You don't have to, but you can. And if it does mean something different, I just don't think it means what the ITC has said it means and what CJ says it means. Because in the context of expression regulation sequences, alteration made sense because it would include things like deletions. In the context of a promoter, if you deleted a promoter, you would decrease expression and that would not make sense at all. So to the extent there are some differences in the context there could be, we just don't think it goes to the level of defining the invention only by substitution. We also think that other extrinsic evidence of record supports that because CJ's expert has admitted that whether you change a nucleotide sequence, a single nucleotide sequence by mutagenesis, or whether you cut and paste according to the method of example four, what you get is a new promoter. There's a more potent promoter there. And it doesn't matter whether you've done the replacement or the substitution. And I see I'm coming up on my time now. Want to save the rest of your time for a moment? Yes, I would. Okay, thank you. Mrs. Morad? May it please the court. We are not litigating here whether DNA mutagenesis was known or not. When the commission looked at the intrinsic evidence, the examiner made clear, I apologize, that the specification did not enable specific alterations to the expression regulation sequence to increase the activity of the protein. And what the patentee did is they did not challenge that characterization of the examiner. And they said we're amending the claim consistent with what the examiner recognized that was enabled, which is the change in by substitution, the native promoter. So the commission followed the law here. And the patentee cannot now come and say, no, we want this broader scope. So as I understand the prosecution history, the examiner said two things. You've enabled substitution of promoters. You haven't enabled alteration of the expression regulatory sequence. So there are two things on opposite sides. The examiner did not say you haven't enabled alteration of promoters. Well, the native promoter is a region of the expression regulation sequence. But there's a lot more in the expression regulatory sequence. There can be other, yes. Or at least there's more. I don't know about a lot more. But the examiner didn't say that any specific alteration within this broader sequence, which includes any specific alteration to the native promoter, that there are no examples in the specification that provide how you can increase DNA expression by following this method of altering specific nucleotide sequences within the entire expression regulation sequence, including within the native promoter sequence. And so they never challenged any of the characterizations of the examiner. And they amended the claim consistent with what the examiner said was enabled, which is the change in by substitution the native promoter. Why would there have even been an enablement concern with taking a promoter, say a six-nucleotide promoter, using any technique you felt like to change the first letter, resulting in a new promoter when the chemical mutagenesis to change the first letter was, I think, by everybody's agreement, well-known in the art? Well, what the examiner said is not that it was not well-known. What he said is that there are no examples that show that when you follow this method, you're going to increase DNA expression of the gene. So what specific alterations need to be made in order to achieve the intended benefit of the invention, which is to increase the expression of the gene itself? They said what the specification enables is when you change by substitution the native promoter and you use a more potent promoter, thereby you increase, it is known that you will increase the expression of that gene. But what specific alterations need to be made to the native promoter or to the expression regulation sequence? The specification did not include any of those examples of that happening. And so the examiner rejected the claims for lack of enablement, based not only on the lack of guidance as to what the expression structure of the expression regulation sequence is, but also lack of guidance on how to increase the DNA expression or the expression of the gene by making those specific alterations. And the patentee did not challenge, I mean, even if the examiner was wrong in making that statement, they didn't challenge that. Right, I guess that seems to me there are two different arguments here. One is that what the examiner said more or less drove them into the choice they made. But the softer argument is that what the examiner said actually left room for them to do several different things. But the thing that they did, the choice they made was, in fact, was to do the extremely safe thing of simply adopting a small variant of the language the examiner had himself articulated as sufficing. That's exactly right, Your Honor.  Thank you. Thank you, Ms. Martin. Mr. Halen? Good morning, Your Honor. It's a great pleasure to be here. I think what's happening here is that Enjinomoto is attempting to divide the term replacing the native promoter with a more potent promoter into the first part of that term, which is replacing. What the commission did in their claim construction and what Enjinomoto told the examiner during prosecution was to look at the whole term. The commissioner said, removing the native promoter, inserting a new promoter. A.J. Enjinomoto during the prosecution said, we're changing the native promoter by substituting with a more potent promoter. Now when they talk about alterations, they're saying, let's look at just the replacing term. They're forgetting that you also have to do something with a new promoter coming in. They're just saying, replace or alter a nucleotide. And that's specifically, as Ms. Maraj has said, what the examiner said was not enabled. You can't make specific changes and expect them to have a function of increasing the YDDG production. And in fact, in the brief, the blue brief, 43 to 44, when Enjinomoto- Can I ask you this question? Is there reason in the record or otherwise to think that if you, say you started with a six nucleotide promoter and you ended with the same six nucleotides, except the first one, the first nucleotide was different. Is there any reason to think that the potential effect on increasing the tryptophan production or whatever would be affected at all by how you made that first letter change? A.J. You wouldn't know whether it would go up, down, or have no effect. And that's the point. You mean so that the effect on the cellular production of the identical six nucleotides might be different according to how you got to them? A.J. No, Your Honor. Actually, promoter is more like 40 or 90 nucleotides. You make one change. You don't know what the effect of that change is. There's no argument that you can make a change. But you have no idea what the effect of that change will be. Will it decrease the promoter? Will it increase the promoter? Or will it do nothing? You just don't know. And that's why the examiner said you haven't enabled making specific alterations to improve production of YDDG, which is the whole point of using a more potent promoter. You want to make greater production of YDDG. And since you don't know which changes you can make, you therefore can't make those changes. In other words, people knew how to distinguish among promoters in terms of potency, but they didn't know what the effect of changing a particular nucleotide sequence might be. A.J. Correct. You could take one out and put a new one in, but you couldn't just change one and expect it to be better or worse. You just wouldn't know. And as I say, when Enjinomoto quoted the rejection, they left out the portion that said you can't enable specific changes. The other thing, one of the questions that you asked was, is there anything else in the specification that talked about substitution? And if you look in the specification at Volume 1, Appendix 190 to 191, it starts out on 190 saying the present inventions are as follows. And then it lists 11 subparagraphs. And one of those subparagraphs, subparagraph number 4 on page 191, says the bacterium, according to the above bacterium, wherein the native promoter of said DNA is substituted with a more potent promoter. In none of those 11 topics do they say altering an individual nucleotide or changing an individual nucleotide. And so the specification, I think, is consistent with the way Enjinomoto interpreted this, with the way the examiner interpreted it, and the way the commission interpreted it, in terms of replacing a promoter with something else, not changing something which had maybe no effect at all. Okay. Anything more? I think not. Thank you very much. Mr. Livingstone? Thank you, Your Honor. I would like to address the point that you were just discussing about specific alterations in the promoter sequence, because I think that's incorrect. The examiner could not have been talking about specific alterations in the promoter sequence because the specification cited conventional methods as mutagenesis, clearly known, and the specification discloses sequence ID number 9, which is the promoter for the YDDG, the native YDDG promoter. Now, the commission found below that there is a clear link between what's called the consensus sequence and promoter strength. And here, there is testimony that those of skill in the art looking at sequence ID number 9 and looking at that promoter would know, as they moved individual nucleotides towards consensus, that would make the promoter stronger. So you could affect promoter strength based on the sequence. Thank you. The next question is to your question, Judge Moore. Under Phillips, you can use the prosecution history, of course, to determine claim scope, but you have to look at the entirety of the intrinsic and extrinsic record. And we think the entirety of the record indicates that there was no narrowing of the claim such that it was to the preferred embodiment of example 4 to this very specific substitution method and to the exclusion of decades-old methods of mutagenesis to increase promoter strength. Okay. Anything further? No, Your Honor. Okay. Thank you. Thank all counsel. The appeal is submitted and we'll turn to the cross appeal. And here we start with Mr. Haley. May it please the Court. Today I'm going to address two issues that are in our appeal, and both are dispositive with respect to String 4151. The first is the commission erred at law in disregarding the Festo instructions that in order to find rebuttal on the tangential prong, the reason for the amendment must be apparent from the prosecution and that the prong is rarely invoked and is very narrow. Secondly, I want to address written description. Here the commission ignored Arias' core principle that you need to have a representative number of species, and the commission pointed to four that are not representative of the virtually infinite number of more potent promoters that are described. So let's talk about Festo. As a first step in Festo for tangential rebuttal, you need to look to the prosecution history and find an objectively apparent reason for the amendment. Here the commission found nothing. They cited nothing from the prosecution. And if you look at the commission's decision, Volume 1, 43 to 44, nothing in the prosecution gave a reason for the amendment. And if you look for that, it's Volume 1, Appendix 5617. What the prosecution said, and this is at Volume 1, 56, also 5617, they said, in view of this amendment, Lipschitz, which is the prior act, no longer anticipates. All that says is I've distinguished the prior act. It doesn't say I'm taking back some of my amendment. It says I've distinguished the prior act. That's not enough to allow tangential rebuttal. Second, Amgen's narrowing amendment took a claim that was this big, covering any protein that had one or more changes compared to sequence ID2. One or more. Wasn't there some sort of several limit? Yes, one or several changes. That's correct. But one or more could change everybody, one of them, right? That's true. And so the claim was this big. Now they said the claim is this big. It's sequence ID2 and those things that hybridize to it. And on the Festo, you've given up, surrendered, the thing between the old claim and the new claim. Angiomoto never said in the prosecution, well, we're not actually giving up all of that. We're only giving up a part of it. Under public notice, the public is allowed to rely on what Angiomoto chose to make the amendment. Maybe they could have made a different amendment, but I think as Judge Moore said on the replacing side, they didn't. This is what they chose to do. And CJ is allowed to do that. And it's not disputed that 4151 does not hybridize to sequence ID1. I'll now turn to lack of written description. Can I just ask? Absolutely. Would your argument be any different if it were apparent, just by assumption, if it were apparent that the reason for the amendment was to bring the claim down to YDDG proteins and to avoid, was it Lipschitz, was it YFIK or something? If in the amendment, which obviously didn't happen, the patentee, the applicant at the time had said, my amendment is designed to only cover YDDG proteins, then we might have had a different case. But that's not what they said. They said, my amendment gets rid of the prior art and nothing else am I saying about it as being less than that. Okay. So now take the opposite as an assumption. Let's assume that they said, we are trying to get down to YDDG proteins. Then how do we think about the tangential nature question? Then they would have to show, I think, that the function way result would, the tangential question, I think, would be a more difficult case for us because they could legitimately say, your YDDG protein falls within the claim by the doctrine of equivalence because we didn't mean to exclude that. But that's not the case here. On written description, as Dr. Ropey said at volume 1A1135 question 305, the genus of multiple promoters is virtually infinite. It can come from any organism. And the commission's decision cannot stand under AREAD for three reasons. One, the four promoters to which it points are not representative of this genus. In fact, they are representative of three E. coli and one viral promoter. Secondly, testing known promoters to see which one of them may be more potent than the YDDG promoter when the YDDG promoter was not known and its strength was not known is not written description. It doesn't show a recognition of the genus of more potent promoters. And finally, there's no common structure that links more potent promoters. Turning to the first, representative species. As Dr. Ropey said, it's a virtually infinite number of promoters fit within the more potent promoters. All of them have different structures. Dr. Stephanopoulos, engine and motors expert, said that in his 1998 textbook, volume 3A6285. AVV Deutschland is a very similar case. Yes, it's about antibodies, but there were 300 antibodies, not just four promoters. And those 300 antibodies weren't representative of the entire class of antibodies because they differed in structure, just like the promoters in this case in more potent promoters differ in structure. Second, finding that the person skilled in the art could actually go off and test the promoters that were known in the art to see which ones were more potent, that's an ailment. That's not written description. And Ariad specifically says at 1356, an invitation for further research does not constitute written description of a class of compounds used in a method. And when you look at the various written description cases, when there's known promoters in the art, known compounds in the art, that are known to have the specific activity that's required in the claim, that's a different story. This is not that. Here, promoters were known in the art, but not which ones were more potent. And so that doesn't allow the skilled worker to visualize what the genus of more potent promoters was. And M. Gen. Sanofi is another good example. There they said, at page 1377-78, they said finding of adequate written description merely from a finding of ability to make and use runs afoul of what is perhaps the core ruling of Ariad. So you can't go off and just test, that's a research plan, that's not written description. And finally, the decision at 46, subparagraph 4, that there's a consensus sequence leaking the more potent promoters is wrong. It mischaracterizes the art at the priority date. Ariad says that's where you look for written description, the priority date. And at the priority date, it was textbook knowledge that the consensus sequence did not apply to E. coli. And one example of that is the Jensen textbook from 1998, volume 4, A. 9149. Statements made about what was going on 15 years earlier, that's not substantial evidence. You have to look at what the skilled worker knew at the priority date, and here at the priority date, the skilled worker knew that the consensus rule did not link E. coli promoters, which is the specific bacterium of the claim. So we ask that you reverse the commission and find the 655 patent invalid, the lack of written description. Thank you. I'll reserve the rest of my time. May it please the court. CJ admits that the promoters were known in the art. They argue that the YDDG promoter was not known. The commission disagreed with that specific point. The commission found, for example, at appendix 145, 146, that the native promoter was known by virtue of the disclosure of sequence ID number 9 in the 655 patent specification. And the commission also stated that there is a specific method here that is defined in the specification to assess the potency of the native promoter and to compare the other promoters that are well-known in the art relative to the native promoter. In terms of the tangential issue, would it be fair to say that the claim amendment that we have here went from a structural definition of the protein to essentially a way of describing the way the protein was made? Your Honor, that is correct. I mean, what the hybridization does is that you don't have to have the exact gene that encodes for that protein that would be within the scope of the claim. When you allow for hybridization, you expand the breadth of the claim and you allow something that is homologous to sequence ID number 1, which is the sequence of the YDDG gene. It seems to me what the ITC said here is that because we end up with the same protein, that somehow the amendment is tangential. Whereas it seems to me that the amendment was designed to define the end result in terms of the process by which it was made as though it's sort of a product-by-process claim. And that the fact that you end up with the same thing by a different process, I'm not sure that I understand why that makes it tangential. That was not the only reason. So you think that reason isn't a good one? No, I actually believe that that reason is a good one because that reason yields an absurd result because we have a protein that is within the range of equivalence. Well, what's absurd about the result? I mean, what they're saying is we're covering certain proteins, but we're defining what's covered in terms of the way it's made, essentially. Right. But when you look at the reason, and it's incorrect to say that the Commission did not look at the prosecution history because at Appendix 44, the Commission stated that what the amendment was meant to do was to exclude these other types of genes like the YFIK gene, which are not homologous to the YDDG gene and which are not going to hybridize, so they're not expected to code for a protein that is equivalent to the YDDG protein. And there is no evidence in the prosecution history that any of the genes was anything other than the native form of the gene. So here what we have is a gene that hybridizes in its native form. But when they apply codon randomization, which has no scientific use whatsoever but only takes advantage of the redundancy of the genetic code, so you end up with the same protein. I don't think that's really responsive to the suggestion I made. They chose to make an amendment which defined the thing in terms of the process by which it was made. And it seems to me that what the Commission did is to say that doesn't matter as long as we end up with the same protein. That is not... The fact that you end up with the same protein is part of the analysis, but it's not the entire analysis. The analysis that the Commission did was that you have a gene that hybridizes in the native form and codes for the exact same protein as the codon randomized version of the gene. And when you look at the reason, because that's what the law says, is what is the rationale behind the amendment? If that reason is related to the accused equivalent, then yes. But here what happened is that they narrowed the claim term to exclude genes that, in their native form, there is no evidence that those genes were not anything other than their native form, that are so different from the YDDG gene that they would not hybridize and they would not code for a protein that is equivalent to the YDDG protein. Okay. All right. Thank you, Ms. Mora. Mr. Livingstone? Thank you, Your Honor. May it please the Court. Going to the tangential exception. First, the limitation at issue was never amended. Sequence ID number two was never amended. Under Honeywell, estoppel is on a limitation by limitation basis. We believe that estoppel should not apply at all. To the extent estoppel, the Court finds that estoppel does apply, we do think the tangential exception applies because Festo says you only surrender if the rationale is not discernible from the prosecution history of record. And we think the rationale for the amendment is manifest throughout the prosecution history. The examiner said, you've got this term that properly interpreted could virtually read on any protein. And we identify this one that happened to be from one of our inventors called YFIK. And so your term... The problem is if you make an amendment, even if the amendment is broader or different than what would have been required by the examiner's rejection, you're still stuck with it. And it seems to me that the tangential argument that you're making basically says, well, it's tangential if it covers more than was necessary to avoid the rejection. Our tangential argument is that the amendment was made to define the claim scope to YDDG proteins and variants thereof by species or by how they're encoded by DNA. What we gave up was totally unrelated YFIK proteins and proteins in between other proteins that might have been there. Is the following a version of what you're saying? I just may misunderstand. The amendment was about confining the resulting proteins. The equivalence analysis for purposes of whether the codon randomized sequence is tangential to that is tangential to changing the protein because it doesn't change the protein. That's the whole point of codon randomization, that you can have different triplets producing the same sequence of amino acids and therefore the same protein. Respectfully, I don't think that quite works because I think that by not changing the protein, they are a YDDG variant. And what we were trying to give up were non-YDDG variants. And so under the equivalence analysis, under sequence ID number 2, you have a codon randomized version of a non-E. coli species that does the exact same thing as other things that literally infringe, which is the definition of the use of doctrinal equivalence. But you chose to define what was claimed by the amendment in terms of how the protein was made, right, essentially. I don't know that it's how the protein was made. It's a DNA sequence that when read by... I'm simplifying it, but is that not an accurate sort of summary, layman's summary? The DNA sequence does ultimately end up translated into the protein. Yeah. That's right. But you chose to define it that way. And why aren't you stuck with that? And why is that tangential? Because we chose to define it that way in view of prior art that had nothing to do with YDDG. In cases from this court have said, if the prior art doesn't have anything to do with the amendment at hand, here the prior art wasn't non-E. coli YDDG species. It wasn't codon randomized versions of those sequences. It was a totally unrelated YFIK protein that had nothing to do with this protein at all. On the 112 issue, the commission made specific findings on the representative species, including identifying the four examples that are in the patent. The patent describes those four examples and also describes and the like. It specifically discloses other examples that were well-known in the art, like the Deutschel article. There are numerous prior art articles on the front of the patent that also disclose other promoters. And there are hundreds of examples of more potent promoters that are in the art and have record described in our blue brief, for instance, at page 15. More importantly, there was a finding that the consensus link did exist at the time of patenting. And in fact, the quote that's in CJ's gray brief at 11, that at the time of the patenting, the promoter efficiency cannot be predicted entirely from conformity to consensus sequence. The beginning of that quote says, occasional exceptions to this rule show. And that's not in the brief. But that's what Lewin says. The paragraph before says, consensus sequence is the rule. What about Jensen? Jensen? I think Mr. Haley referred to Jensen, which is a 1998 article as indicating. So on page 10. I'm going to summarize. So on page 10. Consensus sequence didn't apply to ECO. They state that Jensen shows promoters which differ from consensus at the minus 35 and minus 10 and the spacer, none of which is in Jensen table 2. Under any reasonable reading of Jensen table 2. That's incorrect. Okay. Thank you, Mr. Lewin. Mr. Haley? Just a couple of points, Your Honor. First of all, there's been a lot of discussion about what the amendment said in terms of tangential. And what is clear from appendix page 44 in the decision, the commission never pointed to anything in the prosecution. Now there's an argument that it was meant to exclude only YFIK, not YDG. It was amended to exclude only the native forms of genes, not codon randomized genes. It was to exclude non-YDD genes. None of that's in the prosecution. The prosecution simply says Lipschitz no longer anticipates in view of the amendment. The public notice allows CJ and the public to rely on the amendment that Angiomoto chose. Second, on the discussion of examples of more potent promoters in the art. There's no examples of more potent promoters in the art. There's examples of promoters in the art. To determine if it's more potent, which is a comparison, you need to compare it to the strength of the YDD gene promoter. And that was not known at the filing, at the priority date. Sequence ID 9 in the specification is a 160 base pair sequence. It doesn't identify what the promoter is. The promoter is somewhere in there. But it certainly doesn't identify the strength of the promoter. Thank you very much. Okay, thank you. Thank all counsel. The case is submitted.